UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

DEAN BOWMAN,

                                   Plaintiff,              **FIRST AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL**

        -v-

THE CITY OF NEW YORK, New York City Police      **12-CV-2011 (SAS)**
Department Officer CARLOS MATOS (Shield No. 1950),
NYPD LIEUTENANT THOMAS O'NEIL, in their
individual capacities,

                                    Defendants.

------------------------------------------------------------------------x

       Plaintiff Dean Bowman, by his attorney Robert M. Quackenbush of Rankin & Taylor, PLLC, as and for his first amended complaint, does hereby state and allege:

## PRELIMINARY STATEMENT

1.  This is a civil rights action brought to vindicate plaintiff's rights under the First, Fourth and Fourteenth Amendments of the Constitution of the United States, through the Civil Rights Act of 1871, *as amended*, codified as 42 U.S.C. § 1983, and pendant claims through the Constitution and laws of the State of New York.

2.  Plaintiff Dean Bowman's rights were violated when officers of the New York City Police Department ("NYPD") unconstitutionally and without any legal basis arrested Mr. Bowman and had him involuntarily admitted to the psychiatric wing of a local hospital in retaliation for his lawful refusal to be stop-and-frisked where the police lacked reasonable suspicion to do so. By reason of defendants' actions, particularly their unlawful and humiliating arrest, Mr. Bowman was deprived of his constitutional rights.

3.  Mr. Bowman also seeks an award of compensatory and punitive damages and attorneys' fees.

1

**JURISDICTION AND VENUE**

4. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343 (3-4). This action is brought pursuant to 42 U.S.C. § 1983 for violations of Mr. Bowman's rights under the First, Fourth and Fourteenth Amendments to the Constitution of the United States.

5. Pursuant to New York State General Municipal Law § 50-G, Mr. Bowman filed a timely Notice of Claim with the New York City Comptroller on or about June 21, 2011, within 90 days of the events herein complained of. Thus, this Court has supplemental jurisdiction over Mr. Bowman's claims against defendants under the Constitution and laws of the State of New York because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

6. Mr. Bowman's claim was not adjusted by the New York City Comptroller's Office within the period of time provided by statute.

7. Venue is proper pursuant to 28 U.S.C. § 1391 in that Mr. Bowman's claim arose in the Southern District of New York.

8. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

**PARTIES**

9. Plaintiff Dean Bowman is, and was at all times relevant to this action, a resident of the County and State of New York.

10. Mr. Bowman is an African-American male.

11. Defendant The City of New York ("City") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately

responsible. The City assumes the risks incidental to the maintenance of a police force, as well as the employment of police officers, as said risks attach to the public consumers of the services provided by NYPD.

12. NYPD Officer ("P.O.") Carlos Matos (Shield No. 1950) and NYPD Lieutenant ("Lt.") Thomas O'Neil (referred to collectively as the "individual defendants") are and were at all times relevant herein, officers, employees and agents of the NYPD. The individual defendants are being sued in their individual capacities.

13. At all times relevant herein, P.O. Matos and Lt. O'Neil were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of NYPD and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

## STATEMENT OF FACTS

14. The events described herein occurred primarily in the vicinity of Bradhurst Avenue and West 150th Street in the County of New York on June 15, 2011 at approximately 10:15 p.m. and thereafter.

15. After getting off the subway at the 145th Street B/D train stop, Mr. Bowman walked north on Bradhurst Avenue heading towards his home in Harlem.

16. After walking a few blocks, Mr. Bowman sat on a sidewalk bench to rest and have a drink of water.

17. As Mr. Bowman was drinking his bottle of Poland Springs bottled water, an NYPD vehicle approached the area and slowed down once it reached Mr. Bowman's vicinity, eventually coming to a stop in front of his location on the sidewalk bench.

18. P.O. Matos and Lt. O'Neil got out of the NYPD vehicle and walked towards Mr. Bowman, who was still sitting on the sidewalk bench with his backpack and Ikea bag.

19. As the officers approached Mr. Bowman, Lt. O'Neil asked, in sum and substance, "WHAT'D YOU PUT IN YOUR POCKET?"

20. In response, Mr. Bowman truthfully replied he had not put anything at all into his pocket.

21. Despite having no good-faith basis to do so, Lt. O'Neil said, in sum and substance, "I WANNA SEARCH YOU."

22. Knowing there was no objectively reasonable reason to suspect he was involved in any criminal activity, Mr. Bowman told the officer he would not consent to a search.

23. Lt. O'Neil became enraged at Mr. Bowman's non-consent and yelled, in sum and substance, "YOU REFUSING TO COMPLY? STAND UP AND EMPTY YOUR POCKETS."

24. In response to that unlawful command, Mr. Bowman stated, in sum and substance, "No. I'm not emptying my pockets."

25. Upon hearing Mr. Bowman's refusal, Lt. O'Neil told P.O. Matos, in sum and substance, "CALL ANOTHER CAR."

26. The officers then grabbed Mr. Bowman and forcibly placed him under arrest by rear-cuffing him.

27. The officers applied handcuffs in an unnecessarily tight manner, causing Mr. Bowman to experience pain and eventually numbness in his right hand and wrist.

28.  When Mr. Bowman was placed in handcuffs, he legitimately feared the officers were going to cause him grave physical harm, as NYPD officers had done to many other African-American males over the years. Mr. Bowman began stating that the officers wanted to harm him because he was "Black and unemployed."

29. Mr. Bowman further stated that "the NYPD hates Black people" and "the NYPD kills Black men."

30. Soon thereafter, several other officers arrived in the area and observed Mr. Bowman being arrested.

31. The officers then put Mr. Bowman in the back of the NYPD vehicle.

32. Knowing they had no legal basis to detain Mr. Bowman, the officers conspired to have Mr. Bowman involuntarily committed to a local hospital psychological hospital in retaliation for his refusal to submit to an unlawful search and in retaliation for his allegations that he was being detained on the basis of his race.

33. Accordingly, instead of releasing Mr. Bowman or taking him to a local precinct, the officers transported him to Harlem Hospital Center against his will.

34. There, he was involuntarily detained to the hospital's psychological ward and evaluated without his consent.

35. Mr. Bowman's medical records from the incident indicate he was diagnosed with a "conflict with the police," not any medical or psychiatric condition which would justify his arrest or involuntary commitment. The records further stated Mr. Bowman "does not appear to be paranoid," but, understandably under the circumstances, he was "somewhat irate."

36. At approximately 1:00 a.m., having found no valid reason to continue detaining him, hospital staff told Mr. Bowman he was free to leave, which he did.

37. As a result of the defendants' conduct, Mr. Bowman was wrongfully in custody for approximately three hours.

## FIRST CLAIM
## DEPRIVATION OF RIGHTS
## UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983

38. Mr. Bowman incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

39. Defendants, under color of state law, subjected Mr. Bowman to the foregoing acts and omissions, thereby depriving him of his rights, privileges and immunities secured by the First, Fourth, and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights: (a) freedom from unreasonable seizure of his person, including the excessive use of force; (b) freedom from arrest without probable cause; (c) freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which Mr. Bowman was aware and did not consent; (d) freedom from retaliation for expression and speech protected by the First Amendment; and (e) the enjoyment of equal protection, privileges and immunities under the laws.

40. Defendants' deprivation of Mr. Bowman's constitutional rights resulted in the injuries and damages set forth above.

## SECOND CLAIM
## SUPERVISORY LIABILITY FOR DEPRIVATION OF RIGHTS
## UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983

41. Mr. Bowman incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

42. By failing to remedy the wrongs committed by his subordinates, in failing to properly train, screen, supervise, or discipline his subordinates, and by personally participating in the constitutional injuries set forth above, Lt. O'Neil caused damage and injury in violation of Mr. Bowman's rights guaranteed under the United States Constitution, including its First, Fourth, and Fourteenth Amendments.

43. As a result of the foregoing, Mr. Bowman was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**THIRD CLAIM**
**MUNICIPAL LIABILITY UNDER § 1983**

44. Mr. Bowman realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

45. All of the acts and omissions by the individual defendants described above were carried out pursuant to overlapping policies and practices of the City which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant City and its agency, the NYPD.

46. Defendant City and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

47. The individual defendants arrested and incarcerated Mr. Bowman in the absence of any evidence of criminal wrongdoing and without any reason to believe he was a threat to himself or anyone else. The individual defendants did so notwithstanding their knowledge

that said arrest and incarceration would jeopardize Mr. Bowman's liberty, well-being, safety and constitutional rights.

48. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the City and the NYPD, all under the supervision of ranking officers of the NYPD.

49. The acts complained of were carried out by the individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the City and the NYPD, all under the supervision of ranking officers of the NYPD.

50. The City, by its policymakers, has directly and proximately caused the NYPD's policy, practice and/or custom of suspicionless stops and frisks in violation of the Fourth and Fourteenth Amendments, with deliberate indifference to Mr. Bowman's constitutional rights, by devising, implementing,  enforcing, adopting, sanctioning and ratifying a policy, practice and/or custom of:

    a.  Failing to properly screen, train, and supervise NYPD officers;

    b.  Failing to adequately monitor and discipline the NYPD and its officers; and

    c.  Encouraging, sanctioning and failing to rectify the NYPD's constitutional abuses.

**NYPD's History of a Policy, Practice and/or Custom of Suspicionless Stops and Frisks**

51. The NYPD has a history of conducting suspicionless stops and frisks which traces back to the formation of the "Street Crime Unit" ("SCU") in the 1970's. The SCU was an elite, commando-like squad of police officers whose self-proclaimed mission was to interdict violent street crime in the City and, in particular, to remove illegal firearms from the streets. The SCU was little noticed until Rudolph Giuliani ("Giuliani") took office as Mayor of the

City of New York in 1994. Giuliani had campaigned on a promise of more aggressive law enforcement, and once he assumed office, the SCU became a centerpiece of Giuliani's anti-crime strategy, and its officers became primary enforcers of his highly aggressive policies.

52. The SCU, which consisted predominantly of White men, was deployed in so-called "high crime" areas, largely populated by minorities. Race and/or national origin – not the reasonable, articulable suspicion of criminal activity required under the Fourth Amendment – were often the determinative factors in the SCU's decision to stop and frisk.

53. The SCU's policy, practice and/or custom of suspicionless stops and frisks led to a massive deprivation of constitutional rights. In 1997, the SCU reported over 18,000 stops and frisks, but made less than 5,000 arrests. The next year, the SCU reported a 50% increase in stops and frisks, but even fewer arrests than in 1997. The SCU's own figures revealed that over a two- year period more than 35,000 law-abiding people were stopped and frisked.

54. The unconstitutional practices of the SCU led not only to unlawful stops, searches and seizures, but also to violence. One of the most commonly known incidents occurred in February 1999 when the SCU's tactics turned deadly when four SCU officers killed West African immigrant Amadou Diallo in the Bronx in a hail of 41 bullets as he stood in the vestibule of his apartment building.

55. In 1999, the Office of the Attorney General ("OAG") conducted an investigation and released a study of the NYPD's stop and frisk practices for the period of January 1, 1998 through March 31, 1999, which concluded that there was evidence of racial disparities and disparate impact on the basis of race. Analyzing the stop and frisk data for the time period from January 1998 through March 1999, the OAG found that although Blacks comprised 25.6% of the City's population and Hispanics 23.7%, these two groups made up 83.6% of all

stops by the NYPD. By contrast, Whites were 43.4% of the City's population, but accounted for only 12.9% of all stops. In precincts where Black and Hispanic persons each represented less than 10% of the total population, individuals identified as belonging to these racial groups accounted for more than half (53.4%) of the stops in these precincts. The rate at which stops led to arrests also differed by race: only 1 out of 9.5 stops of Blacks, 1 out of 8.8 stops of Hispanics, and 1 out of every 7.9 stops of Whites resulted in an arrest. These stop-to-arrest rates demonstrated that the stops of Whites were more likely to lead to arrests, whereas those for Blacks were more indiscriminate because fewer of the persons stopped in these broader sweeps were actually arrested. The OAG also found that when examining the crime rate statistics from the New York Division of Criminal Justice Services ("DCJS") during this time period, Blacks were stopped 23% more often than Whites; Hispanics were stopped 39% more often than Whites. Controlling for precincts actually increased these discrepancies. The OAG also estimated that SCU officers completed a UF-250 form (*i.e.,* the form on which all NYPD officers are required to record information about stop and frisk practices) was completed for only 10%-20% of the stops and frisks they conducted.

56. In 1999, the Center for Constitutional Rights filed a class action lawsuit, *Daniels, et al v. The City of New York, et al,* (*"Daniels"*) to challenge the NYPD's unconstitutional policy, practice and/or custom of conducting rampant stops and frisks of individuals without the reasonable articulable suspicion required under the Fourth Amendment and which impermissibly used race and/or national origin – not reasonable suspicion – as the determinative factors in deciding to stop and frisk individuals.

57. In 2003, a settlement was reached in *Daniels* which resulted in a Stipulation that required, *inter alia,* the NYPD to adopt a written policy prohibiting unlawful racial profiling. The

Stipulation also required the NYPD to produce quarterly data concerning the NYPD stop and frisk activity which is contained in its UF-250 forms.

58. During the pendency *of Daniels,* the NYPD claimed it had disbanded the SCU, however, the unlawful practices perfected by the NYPD through the SCU have continued, through other methods, as part of the NYPD's anti-crime strategy.

59. The City has applied a facially neutral policy, the written anti-racial profiling policy, to Mr. Bowman and other Black residents and visitors, in an intentionally racially discriminatory manner.

60. On information and belief, NYPD officers are also under pressure to conduct increased stops and frisks. On information and belief, the stop and frisk reports are tracked and evaluated at the NYPD's weekly CompStat meetings where commanders are questioned about their precinct's crime statistics. CompStat focus gives NYPD officers a strong incentive to generate UF-250s because an officer's UF-250 numbers suggest productivity.

61. Public accounts provide further evidence of unlawful stops and frisks which lack the reasonable suspicion required by the Fourth Amendment and reveal intent to discriminate on the basis of race. For example, on October 10, 2006, the *Daily News* reported that NYPD officers informed the news source that they were given a roll call order by Captain Michael Vanchieri to stop, question and frisk <u>all</u> black males at the Seventh Avenue Park Slope subway station in Brooklyn after he described a series of robberies on the F subway line in Brooklyn that were concentrated near that station. This directive prompted calls by One Hundred Blacks in Law Enforcement and the National Latino Officers Association for an investigation of police commands that were indicative of racial profiling.

62. A report by the New York City Civilian Complaint Review Board ("CCRB") also shows that the incidents of unlawful stops and frisks have risen dramatically since 1999. The CCRB reported that in 1999, 1,240 individuals made complaints of being subjected to stops and frisks which were an abuse of police authority. In 2006, the complaints for improper stops and frisks totaled 5,089; the overall total for complaints made for that year was 7,669. According to the CCRB, the substantiation rate for allegations of unlawful stops and frisks was at least more than twice the rate for any other allegation made from 2002 through 2006.

**NYPD's Suspicionless Stop and Frisk Practice is A Direct and Proximate Result of The City's Policies, Practices and/or Customs**

63. The Fourth Amendment prohibits police officers from conducting stops and frisks without a reasonable, articulable suspicion of criminal conduct; frisking persons without a reasonable belief that they are armed or presently dangerous; searching and seizing persons without probable cause; or using excessive force in the course of policing activities. Additionally, the Equal Protection Clause of the Fourteenth Amendment bars police officers from targeting individuals for stops and frisks on the basis of race or national origin.

64. The pervasive unconstitutional practices of the NYPD are a direct and proximate result of policies, practices and/or customs devised, implemented, enforced and sanctioned by the City, NYPD Commissioner Raymond Kelly and New York City Mayor Michael Bloomberg and their confederates whose identities are presently unknown, with the knowledge that such policies, practices and/or customs would lead to violations of the Fourth and Fourteenth Amendments. Those policies, practices and/or customs include: (a) failing to properly screen, train and supervise NYPD officers, (b) failing to adequately monitor and discipline NYPD officers, and (c) encouraging, sanctioning and failing to rectify the NYPD's custom and practice of suspicionless stops and frisks.

**Failure to Properly Screen, Train and Supervise NYPD Officers**

65. Although fully aware that the work of the NYPD demands extensive training, superior judgment and close supervision, the City, Commissioner Kelly and Mayor Bloomberg failed to properly screen, train and supervise NYPD officers, knowing that such failures would result in violations of the Fourth and Fourteenth Amendments.

66. The Stipulation of Settlement in *Daniels* required the City, Commissioner Kelly and Mayor Bloomberg to implement numerous training requirements concerning racial profiling. On information and belief, they have failed to properly train and supervise NYPD officers, including supervisors, concerning the legal and factual bases for conducting stops and/or frisks that comply with the Fourth and Fourteenth Amendments in an effective manner.

67. The inadequate screening, training and supervision of the NYPD is a direct and proximate cause of the NYPD's rampant unconstitutional stops and frisks. As a direct and proximate result of the City's failure to screen, train and supervise NYPD officers, tens of thousands of people have been subjected to unlawful stops and frisks, many times simply because of their race and/or national origin. By failing to properly screen, train and supervise NYPD officers, the City, Commissioner Kelly and Mayor Bloomberg have acted recklessly and with deliberate indifference to the constitutional rights of those who would come into contact with the NYPD.

**Failure to Monitor and Discipline NYPD Officers**

68. The NYPD's widespread abuses are also a direct and proximate result of the failure of the City, Commissioner Kelly and Mayor Bloomberg to properly and adequately monitor, discipline and take necessary corrective action against NYPD officers who engage in, encourage or conceal unconstitutional practices. Among other things, they knowingly, deliberately and recklessly have failed:

a.  to take appropriate disciplinary action and corrective measures against NYPD officers who have engaged in suspicionless stops and frisks;

b.  to adequately monitor NYPD officers who have incurred a substantial number of civilian complaints, even in instances where the number of complaints should have triggered monitoring under established departmental guidelines;

c.  to devise and implement appropriate oversight, disciplinary and remedial measures in the face of extensive evidence that no charges are brought against the overwhelming majority of persons stopped and frisked by NYPD officers;

d.  to conduct adequate auditing to determine if the stop and frisks conducted by NYPD officers comply with the NYPD's written policy prohibiting stop and frisks that are not based upon reasonable suspicion and use race and/or national origin as the determinative factor in initiating police action;

e.  to take sufficient, if any, steps to curb NYPD officers' non-compliance with departmental directives requiring that UF-250 forms be completed for each stop and frisk;

f.  to take sufficient corrective and remedial action against NYPD officers who provide fabricated, false, or impermissible justifications for stops and frisks; and

g.  to take sufficient corrective, disciplinary and remedial action to combat the so-called "blue wall of silence," wherein NYPD officers regularly conceal or fail to report police misconduct, *inter alia,* in sworn testimony, official reports, statements to the Civilian Complaint Review Board ("CCRB") and the Internal Affairs Bureau, and in public statements.

69. The City, Commissioner Kelly and Mayor Bloomberg failed to properly and adequately monitor, discipline and take necessary corrective action against NYPD officers, knowing that such omissions would lead to violations of the Fourth and Fourteenth Amendments. By such acts and omissions, the City, Kelly and Bloomberg have acted recklessly and with deliberate indifference to the constitutional rights of those who would come into contact with the NYPD, including Mr. Bowman.

**Encouraging, Sanctioning and Failing to Rectify the NYPD's Suspicionless Stops and Frisks**

70. With the knowledge that such acts and omissions would create a likelihood of Fourth and Fourteenth Amendment violations, the City, Commissioner Kelly, and Bloomberg also have encouraged, sanctioned and failed to rectify the NYPD's abusive and unconstitutional practices.

71. For example, the City and its policymakers, on information and belief, have enacted and enforced unwritten "productivity standards" or *de facto* quotas of a certain number of stops and frisks and specific types of arrests per month for each NYPD officer. On information and belief, NYPD officers who fail to meet the productivity standards face adverse employment consequences. In their efforts to satisfy the productivity standards, NYPD officers have engaged in widespread suspicionless stops and frisks of individuals.

72. As a direct and proximate result of the above policies, practices, and/or customs, tens of thousands of people have been, and will continue to be, subjected to unconstitutional stops, frisks, searches and seizures by NYPD officers, sometimes in violent encounters, simply because such individuals happen to be the "wrong" color, in the wrong place, at the wrong time. Through such acts and omissions, the City, Commissioner Kelly, and Bloomberg have acted recklessly and with deliberate indifference to the constitutional rights of individuals

who would come into contact with the NYPD through no fault of their own, such as Mr. Bowman.

73. By deploying officers – whose training in the legal requirements for a stop-and-frisk were woefully deficient and whose supervision was inadequate to remedy obvious and ongoing constitutional violations to Black men in New York City – in Mr. Bowman's neighborhood, NYPD policymakers acted with deliberate indifference to the Fourth and Fourteenth Amendment rights of Mr. Bowman and other Black men.

74. Given the City's ample knowledge of its failure to adequate train and supervise officers concerning stop-and-frisk requirements, it was entirely foreseeable and predictable that Lt. O'Neil and P.O. Matos would order Mr. Bowman to submit to a stop and frisk when no reasonable officer would believe that seizure would be supported by reasonable suspicion.

75. Given the well-known humiliating and demoralizing impact that the City's stop-and-frisk practices have on innocent civilians subjected to those searches in their own neighborhoods,[1] both Mr. Bowman's refusal to submit to the seizure and his statements regarding the NYPD's intentions towards Black people were entirely reasonable and predictable results of a baseless stop.

76. Further, given the well-known humiliating and demoralizing impact of the City's stop-and-frisk practices, NYPD policymakers would know that refusing to submit to a suspicionless stop-and-frisk and communicating dislike and distrust of the NYPD as a result of such stops does not make a person likely to harm themselves or another person, within the meaning of New York Mental Hygiene Law.

---

[1]    *See* Center for Constitutional Rights, *Stop and Frisk: The Human Impact*, July 2012, *available online at* http://stopandfrisk.org/the-human-impact-report.pdf (last viewed Aug. 29, 2012).

77. Thus, for those reasons, the above-described policies, practices and omissions were the moving forces behind Mr. Bowman's arrest in this matter.

## FOURTH CLAIM
### *RESPONDEAT SUPERIOR* LIABILITY OF THE CITY OF NEW YORK FOR VIOLATIONS OF THE LAWS OF THE STATE OF NEW YORK

78. Mr. Bowman incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

79. The conduct of the individual defendants alleged herein, occurred while they were on duty and in uniform, and/or in and during the course and scope of their respective duties and functions as NYPD officers, and/or while they were acting as agents and employees of the City, clothed with and/or invoking state power and/or authority, and, as a result, the City is liable to Mr. Bowman for state law violations pursuant to the state common law doctrine of *respondeat superior*.

80. As a result of the foregoing, Mr. Bowman was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## FIFTH CLAIM
### ASSAULT AND BATTERY UNDER THE LAWS OF THE STATE OF NEW YORK

81. Mr. Bowman incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

82. By the actions described above, defendants did inflict assault and battery upon Mr. Bowman. The acts and conduct of defendants were the direct and proximate cause of injury and damage to Mr. Bowman and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

83. As a result of the foregoing, Mr. Bowman was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## SIXTH CLAIM
## FALSE ARREST AND FALSE IMPRISONMENT
## UNDER THE LAWS OF THE STATE OF NEW YORK

84. Mr. Bowman incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

85. By the actions described above, defendants caused to be falsely arrested or falsely arrested Mr. Bowman, without reasonable or probable cause, illegally and without a warrant, and without any right or authority to do so.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to Mr. Bowman and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

86. As a result of the foregoing, Mr. Bowman was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## SEVENTH CLAIM
## VIOLATION OF RIGHT TO EQUAL PROTECTION OF LAW
## UNDER THE LAWS OF THE STATE OF NEW YORK

87. Mr. Bowman incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

88. By the actions described above, defendants violated Mr. Bowman's right to equal protection of law by intentionally discriminating against on the basis of Mr. Bowman's membership in a protected class. The acts and conduct of the defendants were the direct and proximate cause

of injury and damage to Mr. Bowman and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

**EIGHTH CLAIM**
**NEGLIGENCE**
**UNDER THE LAWS OF THE STATE OF NEW YORK**

89. Mr. Bowman incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

90. No reasonable person would conclude Mr. Bowman was a threat to himself or others and required involuntary hospitalization because he refused to submit to an unlawful search of his person.

91. Similarly, no reasonable person would conclude Mr. Bowman required involuntary hospitalization because he believed the NYPD were arresting him on the basis of his race and lack of employment.

92. The defendants, jointly and severally, negligently caused injuries, emotional distress and damage to Mr. Bowman. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to Mr. Bowman and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

93. As a result of the foregoing, Mr. Bowman was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**JURY DEMAND**

94. Mr. Bowman demands a trial by jury in this action on each and every one of his damage claims.

**WHEREFORE** Mr. Bowman demands judgment against the defendants individually and jointly and prays for relief as follows:

a.    That he be compensated for violation of his constitutional rights, pain, suffering, mental anguish, and humiliation; and

b.    That he be awarded punitive damages against the individual defendants; and

c.    That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d.    For such other further and different relief as to the Court may seem just and proper.

Dated:   New York, New York
         August 31, 2012

Respectfully submitted,

/s/

By:   _____

Robert M. Quackenbush
Rankin & Taylor, PLLC
*Attorneys for the Plaintiff*
350 Broadway, Suite 701
New York, New York 10013
t: 212-226-4507